**Terrie SNYDER, Plaintiff,**

v.

**Samuel J. RINGGOLD, Defendant.**

**Civil Action No. JFM–95–3197.**

United States District Court,
D. Maryland.

March 16, 1999.

---

Jeffrey W. Bredeck, Eccleston & Wolfe, Baltimore, MD, for plaintiff.

Robert C. Verderaime, Baltimore, MD, Mary R. Craig, Towson, MD, for defendant.

## MEMORANDUM

MOTZ, Chief Judge.

Plaintiff, Terrie Snyder, has brought this action against defendant Samuel J. Ringgold, asserting claims under the First and Fourteenth Amendments, along with corresponding state constitutional claims and a state law claim for tortious interference with prospective economic relations. Ringgold has filed a motion for reconsideration of this Court's prior orders in this case, and a motion for summary judgment. The motion for reconsideration will be granted in part. The injunction entered on March 5, 1997 will be dissolved, and summary judgment for Ringgold will be granted as to Counts I and II of the complaint. The motion for reconsideration will also be denied in part, and I will decline to exercise supplemental jurisdiction over Counts III–V of the complaint. Those counts will be dismissed. In addition, because summary judgment will be entered for Ringgold and the injunction will be dissolved, Snyder's motion for attorneys' fees will be denied.

### I.

Snyder is a journalist living in Baltimore City and working in both the print and television media. She has concentrated the majority of her work on crime in the Baltimore metropolitan area and policies of the Baltimore City Police Department ("BCPD"). Ringgold is the Director of the Public Affairs Division of the BCPD. In that capacity, he is responsible for disseminating BCPD information to journalists.

In 1992, Snyder was investigating the death of a young man in Baltimore City for her then employer, WBAL–TV 11. Snyder asked BCPD for the police report about the death. Upon obtaining the report, Snyder learned that she had not been given the complete report on record. The

complete report indicated that a prominent local politician may have been somehow linked to the young man's death. WBAL aired a story indicating that Snyder had been given a less than complete police report and suggesting that BCPD may have been trying to cover up the politician's connection to the death.

In 1993, BCPD instituted a new policy regarding the dissemination of information to journalists. The policy required that all journalists obtain all information about homicides directly from a Public Information Officer ("PIO"). The prior policy had allowed journalists to obtain information directly from homicide detectives.

Because Snyder frequently works as a weekend assignment editor for various news media, she often has to page PIOs on weekends because they are not on duty at headquarters. The PIO on call rotates every weekend. Ringgold serves as the PIO on call every second or third weekend. On those weekends, Ringgold is the only official conduit of information from BCPD.

On May 31, 1994, Ringgold wrote a letter to WBAL about Snyder. He stated that he "told the officers who are new in the Public Affairs Division not to trust Ms. Snyder and never go off the record with her." He also expressed his outrage that an off the record comment he made to a WBAL assignment editor about a new policy in the Homicide Unit was printed in a *City Paper* article written by Snyder. As a result, he stated that he "will never go off the record with people on your [WBAL's] assignment desk and have ordered my staff to do likewise." He stated that, in his opinion, "Ms. Snyder has developed friendships in the department that prevent her from being an objective journalist." Finally, he stated that:

> [W]hen there is breaking news someone from Public Affairs will respond either by telephone or directly to a scene. However, I have grown increasingly frustrated and refuse to chase the scanner with your weekend assignment editors, in particular, Terrie Snyder who seems to take pride in needlessly calling people on weekends.

In January 1995, another of Snyder's employers, WBFF, obtained an exclusive television interview with the "Cold Case Squad" of BCPD's homicide division. Shortly before the filming, Ringgold contacted WBFF's news director and informed him that if the television crew was to include Snyder, it would not be allowed to film or to gain access to BCPD headquarters. As a result, WBFF sent other journalists to film the story.

In March 1995, Ringgold contacted the editor of the *City Paper* and informed her that he would no longer talk to Snyder about any story, but that he would continue to talk to other individuals working for the *City Paper*. In May 1995, Snyder contacted the Public Affairs Division to request information for a story. She was told that her requests for information from BCPD would have to be in writing. Finally, in May 1995, Snyder requested an interview with Police Commissioner Frazier regarding new Department policies. The interview was granted, but limited to a five-minute telephone interview.

Snyder filed the instant action in October 1995, alleging that Ringgold's actions violated her rights under the First and Fourteenth Amendments. On January 6, 1997, Judge Frank Kaufman of this Court granted Snyder's motion for partial summary judgment on her various constitutional claims. On February 14, 1997, Judge Kaufman denied Ringgold's motion for summary judgment based upon his assertion of a qualified immunity defense. On March 5, 1997, Judge Kaufman entered an order of injunction requiring Ringgold to give Snyder access to any BCPD information or interviews that are given to any other members of the media.

On January 15, 1998, the Fourth Circuit reversed Judge Kaufman's February 11, 1997 denial of qualified immunity. Snyder filed a petition for a writ of certiorari with

the United States Supreme Court. On July 28, 1998, I entered an order stating that, in the event that the Supreme Court denied the petition, I would decline to exercise supplemental jurisdiction over the state law claims asserted in Counts III, IV and V of Snyder's complaint. The Supreme Court denied Snyder's petition on October 5, 1998.

Presently pending before this Court are two motions: (1) Ringgold's motion to reconsider Judge Kaufman's entry of the injunction, his denial of Ringgold's motion for summary judgment, and my decision to decline to exercise supplemental jurisdiction; and (2) Snyder's motion for attorneys' fees.

## II.

 Ringgold has moved for reconsideration of Judge Kaufman's orders in light of statements made by the Fourth Circuit in its opinion reversing Judge Kaufman's denial of qualified immunity. I find that the injunction should be dissolved and summary judgment should be entered in favor of Ringgold on the federal constitutional claims.

The Supreme Court and Fourth Circuit have never decided whether a constitutional "right to equal access" for members of the press exists. Judge Kaufman relied in his decision on a 1974 case decided by the U.S. District Court for the District of Hawaii, *Borreca v. Fasi,* 369 F.Supp. 906 (1974). In *Borreca,* the Mayor of Honolulu and his administrative assistant had decided that a particular newspaper reporter had written inaccurate and biased stories about the mayor and his administration. As a result, the mayor instructed his staff to keep the reporter out of the mayor's office. The reporter was therefore denied entry to even general news conferences, open to all media, held in the mayor's office. The reporter and his newspaper brought suit against the mayor and his administrative assistant. The court determined that the mayor's actions violated the reporter's and the newspaper's First Amendment freedom of the press as safeguarded by the Fourteenth Amendment.

The *Borreca* court based its decision on the factual context of the exclusion of the reporter: general news conferences open to all media. *See id.* at 910 ("If he chooses to hold a general news conference in his inner office, for that purpose and to that extent his inner office becomes a public gathering place. When he uses public buildings and public employees to call and hold general news conferences on public matters he is operating in the public and not the private sector of his activities."). In addition, the court specifically acknowledged that it was not addressing whether the mayor would be "required to respond in any way to any question put to him by any representative of any news media" or whether he could "select individual representatives of the news media with whom to meet in situations other than general news conferences." *Id.* at 910–11.

Those situations that the *Borreca* court declined to address are precisely the situations at issue in this case. In his opinion, Judge Kaufman stated that once BCPD "make[s] such information generally available to the news media, [it] may not treat members of the news media, including the reporters working for such news organizations, unequally." He further categorized BCPD's actions as placing "selective restrictions on plaintiff's access to information freely given to other members of the news media."

The flaw in that decision is that Ringgold's policies with respect to Snyder did not deny her "information generally available" or "freely given to other members of the news media." The policies, including the policy not to speak with Snyder about a story, merely exercised Ringgold's right not to answer questions from or meet with particular representatives of the news media. The Fourth Circuit noted in its reversal of Judge Kaufman that "the press has no general First Amendment right of access to information about police investiga-

tions." *Snyder v. Ringgold,* 1998 WL 13528 at \*2 (4th Cir. Jan 15, 1998). If, of course, BCPD holds a general press conference or opens certain files or records to members of the media, then whether it can exclude Snyder presents an entirely different question. However, Ringgold's actions in this case are analogous, as the Fourth Circuit noted, to "the commonly and widely accepted practice among politicians of granting an exclusive interview to a particular reporter" and "the equally widespread practice of public officials declining to speak to reporters whom they view as untrustworthy because the reporters have previously violated a promise of confidentiality or otherwise distorted their comments." *Id.* at \*4.

No reporter has a right to access to a particular interview, exclusive story, or off the record statement. Snyder, therefore, is not seeking equal access to public information, but the kind of preferential treatment that public officials can provide to certain journalists, and that, in Ringgold's opinion, she does not merit. While a constitutional right to equal access for members of the press may well exist, extending the right to encompass preferential treatment would completely change the longstanding relationship and understandings between journalists and public officials. In addition, such an extension would greatly broaden the existing contours of constitutional protection in the First Amendment and Fourteenth Amendment areas.

The injunction entered in this case, rather than simply ensuring that Snyder will receive equal treatment, unfairly provides her with preferential treatment that is not afforded to all other members of the media. For example, if a member of BCPD were to grant an exclusive television interview to Barbara Walters or Diane Sawyer, an interview would also have to be granted to Terrie Snyder under the terms of the injunction. In the same vein, if a member of the BCPD were to provide certain off-the-record information to a news reporter who had proven particularly trustworthy in the past, he or she would have to provide that information to Terrie Snyder, but not to any other member of the news media.

For the reasons set forth above, I find that Ringgold's actions did not violate Snyder's First Amendment or Fourteenth Amendment rights. Consequently, the injunction entered on March 5, 1997 will be dissolved, and summary judgment on Counts I and II will be entered in favor of Ringgold.

### III.

Both sides have asked me to reconsider my decision to decline to exercise supplemental jurisdiction over the state law claims presented in this case. However, I am convinced that my initial decision was correct. To date, the Maryland courts have construed their constitutional provisions as coextensive with, and no more protective than, the corresponding federal provisions. However, Maryland courts are free to interpret the state constitutional provisions as providing broader protection than the federal constitution provides. Allowing those courts the opportunity to make those decisions (if Snyder chooses to refile her action) will not significantly affect judicial economy and efficiency because the factual background of this case is not complicated and can be quickly and easily mastered.

For these reasons, defendant's motion for reconsideration is granted in part. His motion for summary judgment is granted as to Counts I and II of plaintiff's complaint, and the injunction entered on March 5, 1997 is dissolved. The motion for reconsideration is denied as to my decision not to exercise supplemental jurisdiction over Counts III–V of the complaint, and those counts are therefore dismissed. Plaintiff's motion for attorneys' fees is denied. A separate order to that effect is being entered herewith.

## ORDER

For the reasons stated in the memorandum entered herewith, it is, this 16th day of March 1999

ORDERED that

1. Defendant Samuel Ringgold's motion for reconsideration is granted in part and denied in part;

2. The January 6, 1997 memorandum and order entered in this case is vacated;

3. The March 5, 1997 injunction entered in this case is dissolved;

4. Defendant Samuel Ringgold's motion for summary judgment is granted as to Counts I and II;

5. Counts III–V are dismissed without prejudice; and

6. Plaintiff Terrie Snyder's motion for attorney's fees is denied.